**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|   |   |   |
|---|---|---|
| **MARGARET BIRON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No. |
| v. | ) | 09-40084-FDS |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER ON MOTION FOR AN**
**ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying an application for social security disability insurance ("SSDI") and supplemental security income ("SSI") benefits. Plaintiff Margaret Louise Biron appeals the denial of her application on the grounds that the decision is legally erroneous because the administrative law judge ("ALJ") failed to recognize that this case was a remote-onset disability, and that he should have considered additional non-medical evidence under SSR 83-20. In her application for SSDI, Biron stated that she suffered from spastic paraplegia, leg problems, and arthritis. She now disputes the ALJ's holding that she is not "disabled" within the meaning of the Social Security Act, 42 U.S.C. §§ 416.924 (c), (d).

Pending before the Court is Biron's motion for remand for a new hearing and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be granted and the motion to remand will be dismissed.

**I.     Background**

    **A.     Education and Occupational History**

Margaret Louise Biron was born on April 15, 1949. (AR 16). She attended school through the eighth grade. (AR 16). From 1965 until 1991, she worked part-time (about 15-20 hours a week) as a waitress in a restaurant. (AR 21-23, 133). When waitressing became too difficult for her to manage, Biron was transitioned into a position as a hostess until she ultimately stopped working. She has not worked since June 30, 1991. (*Id.*). Her "date last insured" is December 31, 1993.

    **B.     Medical History**

Beginning on March 5, 1982, Biron began complaining of lower back pain. (AR 197). She underwent an exercise program that included physical therapy and some medication, which left her feeling much better when discharged. (AR 197). The laboratory studies were negative, and x-rays of her spine revealed some straightening of the normal curvature; however, everything else was normal. (AR 197). She did not report any radiating pain to the lower extremities, or any numbness or weakness of the lower legs. (AR 198).

In September 1984, Biron caught the fifth toenail of her left foot on something and tripped. (AR 195). X-rays returned negative, and she had full range of motion in the toe. (AR 195). She was subsequently discharged and instructed to keep the toe dry and clean and to apply an ointment twice daily. (AR 196).

On September 23, 1985, Biron went to the hospital with complaints of pain in her left knee upon awakening. (AR 193). There was no trauma to the knee, nor was there any swelling and x-rays were negative for any problems. (AR 193). She was instructed to bandage the knee

for four days and to avoid heavy lifting for 48 hours. (AR 194).

On February 6, 1989, Biron went to the hospital, with complaints of urinary frequency. (AR 184). She was preliminarily diagnosed with stress incontinence which was confirmed by a cystourethroscopy and a Marshall-Marchetti Test. (AR 184-187).[1] On February 23, 1989, she underwent a vesicourethroplasty. (AR 188).[2] The operation was successful and she experienced good results from the procedure. (AR 176).

On January 5, 1992, Biron went to the emergency room with complaints of pain in her right chest that was radiating into her back. (AR 182). She also complained that she could not breathe because of the pain. (AR 182). The x-rays taken showed no evidence of active pulmonary disease, and that her mediastinal structures and heart were within normal limits. (AR 259). She was diagnosed with musculoskeletal chest pain and discharged. (AR 181).

In September 1993, Biron underwent physical therapy in order to treat left shoulder tendinitis. (AR 204). The physical therapy report indicated that her prior level of function in the left shoulder area was pain-free. (AR 205). After two weeks of treatment, she reported minimal to zero pain in the cervical/upper trapezius region with no radiating pain to the upper left extremity. (AR 204). The report indicated that she was independent in walking and climbing stairs and that she had good balance in sitting, standing, and ambulating. (AR 206).

On September 3, 2002, Biron walked into the emergency room with complaints of pain on

---

[1] Stress incontinence is a leakage of urine as a result of coughing, straining, or some sudden voluntary movement due to a weakness of the fascia muscles at the neck of the bladder. A cystourethroscopy is a visual inspection of both the urethra and bladder. A Marshall-Marchetti test is a manual deviation of the bladder neck during strain or cough to ascertain presence of stress urinary incontinence. STEDMAN'S MEDICAL DICTIONARY 862, 435, 1780. (26th ed. 1995).

[2] A vesicourethroplasty is a reconstructive surgery of the bladder and urethra. STEDMAN'S MEDICAL DICTIONARY 1891, 1934.

the left side of her face.  (AR 178).  She complained that the pain was so sharp and constant that she could not even chew food.  (*Id.*).  She was diagnosed with trigeminal neuralgia and prescribed Vicodin and carbamazepine.  (*Id.*).[3]  She was further seen by an orthodontist to examine possible dental issues, but nothing was found.  She was referred to a pain clinic.  (AR 301).  She believes that she was treated with carbamazepine, which helped the pain for about a month.  (AR 299).  However, six months later, she began having the same problem on and off again.  (*Id.*).

On September 2, 2003, Biron had an MRI examination at UMass Memorial Hospital; the examination did not indicate anything out of the ordinary.  (AR 342).  On October 8, 2003, she had a neurological consultation with Dr. Zofia Mroczka who confirmed a diagnosis of trigeminal neuralgia.  (AR 300).  She was continued on carbamazepine, and was also prescribed Neurontin and Topamax.  (*Id.*).[4]  During Dr. Mroczka's examination, he noted that her gait was normal, and that she was able to walk on tiptoes, heels and in a straight line, toe to heel.  (AR 300).  At her follow-up appointment on February 25, 2004, she reported that the carbamazepine and Neurontin were acting reasonably well to control the left facial pain.  (AR 297).  Dr. Mroczka again noted that her gait was normal and that she was able to walk on tiptoes, heels and in a straight line.  (*Id.*).

At the same examination, Biron also complained that she had been suffering neck pain that was radiating to her upper left extremity.  (*Id.*).  Dr. Mroczka diagnosed her as having a cervical

---

[3] Trigeminal neuralgia is a pain of a severe or throbbing nature that effects the fifth cranial nerve. STEDMAN'S MEDICAL DICTIONARY 1853, 119.

[4] Neurontin is an anti-epileptic medication.  Topamax is also an anti-seizure medication.  *See* Drug Information Online, http://www.drugs.com/neurontin.html; http://www.drugs.com/topamax.html (last visited June 30, 2010).

4

muscle sprain and hypercholesterolemia.  (*Id.*).[5]  She was prescribed Elavil and physical therapy. (AR 298).[6]  Dr. Mroczka again noted that she had a normal gait.  (AR 297).  A MRI examination of her neck revealed slight straightening of the normal lordotic curve with spondylosis posteriorly and disc space disease in a few areas.  (AR 245).[7]

About a year later, on February 9, 2005, Biron had a follow-up appointment with Dr. Mroczka where she complained of neck pain radiating to the right upper extremity with intermittent numbness in the second and third fingers.  (AR 296).  She also complained of daily headaches that started at the back of her neck and involved the left frontal temporal region.  (*Id.*). Dr. Mroczka concluded that she was suffering from tension headaches and a cervical muscle sprain, with possible radiculopathy.  (*Id.*).[8]  She was continued on carbamazepine to treat her underlying trigeminal neuralgia, and was further prescribed Skelaxin.  (*Id.*).[9]

A follow-up MRI examination on February 14, 2005, revealed degenerative changes in the cervical spine, as well as minimal bilateral neural foramina narrowing.  (AR 304).[10]  However,

---

[5] Hypercholesterolemia is an abnormally large amount of cholesterol in the cells and plasma of the circulating blood.  STEDMAN'S MEDICAL DICTIONARY, 823.

[6] Elavil is a drug used to treat depression.  *See* Drug Information Online, http://www.drugs.com/elavil.html (last visited June 30, 2010).

[7] Spondylosis is a lesion of the spine of a degenerative nature.  STEDMAN'S MEDICAL DICTIONARY, 1656.

[8] Radiculopathy is a disorder of the spinal nerve roots.  STEDMAN'S MEDICAL DICTIONARY, 1484.

[9] Skelaxin is a muscle relaxant.  *See* Drug Information Online, http://www.drugs.com/skelaxin.html (last visited July 6, 2010).

[10] Neural foramina narrowing is a narrowing of the cavity the nerves pass through in the spine. STEDMAN'S MEDICAL DICTIONARY, 675, 1198.

there was no indication of central canal stenosis.  (*Id.*).[11]  Consequently, Dr. Mroczka diagnosed cervical spondylosis and prescribed aggressive physical therapy.  (AR 305).

During a follow-up visit on April 14, 2005, Dr. Mroczka once again noted that Biron had a normal gait.  (AR 293).  Between May 11 and June 29, 2005, she attended twelve physical therapy sessions.  (AR 309).  At discharge from physical therapy, she reported improved shoulder function as well as decreased shoulder and arm pain.  (*Id.*).

On March 8, 2006, Biron had a follow-up appointment with Dr. Mroczka, who recommended testing for genetic spastic paraparesis, as her son had recently tested positive for that disease.  (AR 292).[12]  It was also noted that she was suffering from a neurogenic bladder.  (AR 292).[13]

Biron had previously undergone a urethral dilatation by Dr. Michael Seelig on January 7, 2003.  (AR 176).  At the time, it was noted that vesicourethroplasty that was performed 14 years earlier had worked well.  (*Id.*).  However, beginning around 2006 she began complaining again of urgency and frequency with incontinence.  (AR 165).  Dr. Samuel Zylstra concluded that Biron was a good candidate for an InterStim IPG implant, and the device was implanted in her on July 24, 2006.  (AR 161).[14]

---

[11] Central canal stenosis is a stricture of the central nervous canal.  STEDMAN'S MEDICAL DICTIONARY, 1673.

[12] Spastic paraparesis is a disorder involving spasms that correlate with a weakness that affects the lower extremities.  STEDMAN'S MEDICAL DICTIONARY, 1297, 1641.

[13] A neurogenic bladder is a bladder that does not function properly due to some issue related to the nervous system.  STEDMAN'S MEDICAL DICTIONARY, 1201.

[14] The InterStim implant is a device that stimulates the sacral nerves with mild electric pulses in order to control an overactive bladder.  *See* Medtronic Online, http://www.medtronic.com/your-health/overactive-bladder/about-therapy/index.htm (last visited July 6, 2010).

On August 31, 2006, Biron tested positive for DNA variants in the SPG4 gene consistent with a diagnosis of, or predisposition to, genetic spastic paraparesis. (AR 343). However, on September 28, 2006, Dr. Mroczka concluded that although she had tested positive, she was asymptomatic. (AR 289). On March 8, 2007, she went to a follow-up appointment with Dr. Mroczka with the same complaints of neck pain, and left-side weakness. (AR 287). Dr. Mroczka concluded that part of the left-side weakness could be related to some symptoms from the spastic paraparesis. (AR 288).

### C.  Administrative Hearing Testimony

At the administrative hearing, Biron testified that many years ago she began having problems with walking and that she would fall and trip for no reason. (AR 19). She testified that the problem began more than 21 years ago (that is, by at least 1987). (*Id.*). The problem has become worse over the years. (AR 20). She testified that some days she cannot even get out of bed because her legs will not work. (AR 21). She also said that this problem is very unpredictable—there are times when she goes to stand up and her legs will not move. (*Id.*).

Biron's ability to work as a waitress was severely hampered by her walking and tripping problems. She testified that she would get sent home often because she would sit down for a break, and her legs would not move when she went to go back to work. (*Id.*). Even a change in positions from waitressing to hostessing did not help her, and she was eventually told by her employer that it was time to take a break from working. (*Id.*). She testified that at that time, around 1991, she only experienced problems occasionally, and that it became worse as the years went on. (AR 22). However, she also testified that she had a hard time working part-time because she was in a great deal of pain. (*Id.*). She said that she would go home and cry, and that

she would have to wait until later in the evening to get up to cook dinner. (*Id.*).

Biron testified that all her physicians did was to put her on physical therapy, which she contends never worked. (AR 24). She testified that she even went to a chiropractor several times (although it is not in the medical records), but to no avail. Furthermore, though she says she has neck pain, she testified that her largest problem area was her back and legs. (AR 25).

She also testified that she suffers from abnormal urinary frequency. (AR 26). She testified that the problem began before 1991, and that it hampered her ability to work. (*Id.*). During an eight-hour shift at her job, she estimated that she would have to use the restroom at least every twenty minutes. (AR 26-27). This made it hard for her to work, and played a part in her decision to stop working, as she would have accidents when she did not make it to the restroom. (AR 27).

Eventually, she ended up leaving her job sometime in 1991. (AR 22). She testified that not only does she not know how to do anything other than waitress due to her eighth-grade education, but also that physically she is incapable of working. (AR 27-28). She contended that she would not even be able to work in a job where she was sitting all day because even sitting for her is painful and uncomfortable. (AR 28). She testified that she can never count on her legs to work, which makes working an impossible task for her. (*Id.*).

## II.    Analysis

### A.    Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's factual findings, "if supported by substantial evidence, shall be conclusive," because

"the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ.  It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 143 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards, and found facts based on the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

### B. Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the definition of "disabled" in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI).  "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).[15]

---

[15] "Complex regulations, administered by the Commissioner of Social Security prescribe . . . [a] protocol for making a disability decision." *Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001).  "Part 404 of Title 20 regulates [SSDI], which is available to those who have paid social security taxes for the required period; Part 416 regulates [SSI], which applies if a claimant has not paid the requisite taxes.  The regulations pertinent here mirror one another, so we refer only to Part [404]" going forward.  *Id.* at 2 n.1.

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4). "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

### C.  The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the procedure set forth in 20 C.F.R. §404.1520(a). He expressly found that Biron had not engaged in any substantial gainful employment during the period from her alleged onset date of June 30, 1991, through her last insured date of December 31, 1993. (AR 9).

At the second step of the evaluation process, the ALJ found that Biron had failed to meet her burden of proof, because there was insufficient evidence of a disability existing prior to the claimant's date last insured, which was December 31, 1993. (AR 11). Specifically, the ALJ

found that there were no medical signs or laboratory findings in the record to substantiate the existence of a medically determinable impairment through the date last insured. (*Id.*). Although Biron testified to, and presented medical evidence of, various symptoms, the ALJ, following SSR 96-4p, declined to find the existence of a medically determinable physical impairment on the basis of symptoms alone.[16]

The ALJ further noted that Biron had tested positive for the SPG4 spastic paraparesis gene in 2006; however, Dr. Richard Goulding, a Disability Determination Service staff physician, concluded that Biron was asymptomatic with respect to that genetic abnormality. Dr. Goulding indicated that his conclusion was based on clinical findings from medical sources covering the period of Biron's alleged onset date through December 31, 1993, and afterwards. (*Id.*). Although Biron testified that her problems with her legs began more than twenty years earlier (when she would trip and fall) and had continually gotten worse (to the point where her legs would stop working in the middle of the day) the ALJ determined that there was not enough evidence to prove a medically determinable physical impairment. (AR 10-11). Therefore, the ALJ found that Biron was not disabled, and stopped his review at the second step of the process. (AR 10-11).

### D. Plaintiff's Objections

Biron seeks a remand to the Office of Disability Review for a new hearing in order to consider additional lay evidence. Biron contends that this case involves a remote onset of disability, and that at the time she became unable to work, she had already experienced

---

[16] SSR 96-4p holds that a "symptom" is not a "medically determinable physical or mental impairment" and no symptom itself can establish the existence of such an impairment. Furthermore, the absence of showing a determinable physical or mental impairment necessarily requires that a claimant be found not disabled at step 2 of the evaluation process.

documented medical symptoms that were of unexplained causation. Although her medical providers were not able to identify a "medically determinable impairment," she argues that her medical record shows symptoms that interfered with her ability to work, even though the medical determination of the cause of those symptoms was not available until 2006 when genetic testing was performed. She contends that the ALJ, when reviewing a case where medical evidence of a remote onset disability was unavailable, should have considered non-medical evidence.

> Biron bases her argument on SSR 83-20, which states in part as follows:
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. . . . The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence on record.

SSR 83-20 applies in cases involving slowly progressive impairments where it is difficult or impossible to establish the precise date that an impairment became disabling. Several courts have held, however, that such a determination concerning the onset of disability does not need to be made unless an individual has been determined at some point to have been disabled during the insured period. *See, e.g., Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). In other words, under that reading, SSR 83-20 only applies if there has been a finding of disability prior to the date last insured and it is necessary to determine when the disability began.

In *Blanda v. Astrue*, 2008 WL 2371419 (E.D.N.Y. 2008), the court suggested that SSR 83-20 might be used to determine whether a disability in fact began before the date last insured. *See id.* at \*14 ("the most logical interpretation of SSR 83-20 is to apply it to situations where the

ALJ is called upon to make a retroactive inference regarding disability involving a slowly progressive impairment, and the medical evidence during the insured period is inadequate or ambiguous," quoting *McManus v. Barnhart*, 2004 WL 331603 at *6 (M.D. Fla. Dec. 14, 2004)).

The basic problem with Biron's position is that there is no medical evidence that she was disabled prior to the date last insured. Lay evidence as to her symptoms prior to 1993 might illuminate or supplement medical evidence, but it cannot serve as a substitute for it. Furthermore, and in any event, even if SSR 83-20 applies, it appears that the proceedings before the ALJ complied in substance with its requirements. First, SSR 83-20 states that the ALJ "should call on the services of a medical adviser when onset must be inferred." SSR 83-20. Here, the ALJ consulted Dr. Goulding, who concluded that Biron was not disabled prior to her date last insured, and that she was asymptomatic at the time she tested positive for the SPG4 spastic paraparesis gene in 2006. Moreover, under SSR 83-20, lay evidence as to onset is permitted only "to the degree that it is not contrary to the medical evidence." *Id.* To the extent that Biron seeks to contradict the medical evidence by establishing that she in fact had spastic paraparesis prior to 2006, it is inadmissible. Finally, and in any event, it appears that the ALJ considered plaintiff's statements and testimony concerning her medical condition prior to 1993, and that no relevant evidence was excluded.

In short, the ALJ did not commit an error of law, and because the ALJ's finding is supported by substantial evidence, it will be affirmed.

### III. <u>Conclusion</u>

For the foregoing reasons, plaintiff Margaret Biron's motion for remand for a new hearing is denied and defendant Commissioner's motion to affirm is granted.

**So Ordered.**

/s/ F. Dennis Saylor<br>
F. Dennis Saylor IV<br>
United States District Judge

Dated:  August 13, 2010